UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHESTER BODMAN,

            Petitioner,                                Hon. Gordon J. Quist

v.                                                  Case No. 1:12-CV-834

LLOYD RAPELJE,

            Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Bodman's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Bodman's petition be **denied**.


## BACKGROUND

As a result of events which occurred on November 19, 2009, Petitioner was charged with the following crimes: (1) operating a motor vehicle while license suspended, revoked, or denied, causing serious injury; (2) failure to stop at the scene of an accident resulting in serious impairment or death; (3) first degree criminal sexual conduct; (4) attempted first degree criminal sexual conduct; and (5) aggravated domestic violence (two counts). (Trial Transcript, May 24,

2010, 14-18). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Brian Bosscher**

As of November 19, 2009, Dr. Bosscher was employed by Spectrum Health as an emergency room physician. (Trial Transcript, May 24, 2010, 163-64). On that evening, Jody Herrmann was transported to the emergency room where she was treated by Dr. Bosscher. (Tr. 166, 184). Herrmann had been involved in an automobile accident, suffering multiple skull and facial fractures, as well as a "devastating" lower leg fracture. (Tr. 167-74).

**MacKenzie Conley**

On November 19, 2009, at approximately 6:30 p.m., Conley was a passenger in a vehicle being driven by Jody Herrmann. (Trial Transcript, May 24, 2010, 189-91). As Herrmann was driving, her vehicle was struck by another vehicle, driven by Petitioner, which had wandered into Herrmann's lane. (Tr. 192-94, 208). Conley testified that she was "nervous" about testifying because Petitioner "already had several people come after [her]" and she was "afraid" that Petitioner would again "send people after [her]." (Tr. 208-09).

**Jake Herrmann**

On the evening of November 19, 2009, Jake Herrmann was a passenger in a vehicle being driven by his sister, Jody Herrmann. (Trial Transcript, May 24, 2010, 221-27). As the vehicle was traveling down the road, it was struck by a vehicle, being driven by Petitioner, which had

wandered "over on the other side of the road." (Tr. 227-33). By the time the police arrived at the scene of the accident, Petitioner had fled. (Tr. 240-41).

**Jody Herrmann**

Herrmann was unable to remember being struck by Petitioner's vehicle or the events immediately prior thereto. (Trial Transcript, May 24, 2010, 260-63). As a result of this accident, Herrmann suffered 14 facial fractures the treatment of which required surgery and the implementation of two titanium plates. (Tr. 265). Herrmann also required surgery to repair the broken bones in her leg. (Tr. 265).

**Jack Pieters**

As of November 19, 2009, Pieters was employed as a Ionia County Sheriff's Deputy. (Trial Transcript, May 24, 2010, 272-77). At approximately 6:20 p.m. that evening, Pieters was dispatched to investigate an automobile accident. (Tr. 278-79). Upon arriving at the scene, Pieters determined that one of the vehicles involved in the accident was registered to Jody Herrmann's mother. (Tr. 281). The other vehicle involved in the accident, a 1998 Lincoln, was registered to Cristine Ruge. (Tr. 281-82).

Upon arriving at the scene, Pieters determined that Petitioner's driving privileges were suspended. (Tr. 313-15). Pieters was unable to speak with Petitioner, however, because he had already fled. (Tr. 312). Pieters was able, however, to speak with Anthony Geister, a passenger in the 1998 Lincoln. (Tr. 288-90). Geister reported that Petitioner had been driving the vehicle at the time of the accident. (Tr. 288-90). Deputy Pieters located a gallon bottle of rum near the

accident scene. (Tr. 290). Geister, who was intoxicated, admitted that he had been drinking rum prior to the accident. (Tr. 290-91). Geister was unable, however, to offer any explanation or insight into the events leading up to the accident. (Tr. 291). A search of the vehicle Petitioner had been driving revealed two devices used to smoke marijuana, a can of alcohol, and a pack of Zig-Zag rolling papers. (Tr. 297-300). Pieters concluded that the vehicle Petitioner was driving was "in the center of the road" when it struck Herrmann's vehicle. (Tr. 306).

**Travis Myers**

As of November 19, 2009, Myers was employed as an Ionia County Sheriff's Deputy. (Trial Transcript, May 27, 2010, 39). Deputy Myers participated in the search for Petitioner after he fled the scene of the accident with Jody Herrmann. (Tr. 39-40). Myers eventually located Petitioner and took him into custody at approximately 4:30 a.m. on November 20, 2009. (Tr. 40-42).

**Cristine Ruge**

Ruge dated Petitioner for several years during which time she bore three of his children. (Trial Transcript, May 27, 2010, 48). Ruge owned a 1998 Lincoln which she permitted Petitioner to use. (Tr. 56-57). At approximately 8:30 p.m. on November 19, 2009, Ruge returned to her residence. (Tr. 51-53). When Ruge arrived home, several people were present including Petitioner; Petitioner's girlfriend, Destiny Roberts; Petitioner's mother; and Petitioner's grandmother. (Tr. 51-52). Destiny and Petitioner departed separately approximately 45 and 60 minutes later, respectively. (Tr. 53-54). Petitioner returned to Ruge's residence approximately 90 minutes later at which point Ruge drove Petitioner home. (Tr. 55-56).

**Charlie Noll**

As of November 20, 2009, Noll was employed as a Detective Sergeant with the Ionia County Sheriff's Department. (Trial Transcript, May 27, 2010, 83-90). Early that morning, Noll was contacted to participate in the ongoing search for Petitioner. (Tr. 90-92). By the time Noll arrived at Petitioner's residence, Petitioner was already in police custody. (Tr. 92).

At approximately 11:30 a.m., Petitioner was interviewed by Detective Noll and Officer Dave Thomas from the Belding Police Department. (Tr. 94-96). Noll interviewed Petitioner concerning the automobile accident and Thomas interviewed Petitioner about a related matter. (Tr. 94-97). Prior to beginning the interview, Petitioner was informed of his Miranda rights. (Tr. 96). Petitioner waived his rights and agreed to speak with the officers. (Tr. 96-97). Petitioner acknowledged that he was driving the vehicle that struck Jody Herrmann's vehicle. (Tr. 98-105). Plaintiff further acknowledged that prior to the accident he and his passenger, Tony Geister, had been drinking beer and rum. (Tr. 98-105). Petitioner stated that immediately following the accident Herrmann was screaming so much that he got "scared" and "left the scene." (Tr. 102).

**Lacey Taylor**

Late in the evening of November 19, 2009, Taylor heard a knock on her front door. (Trial Transcript, May 27, 2010, 118-20). When Taylor answered her door, she observed Destiny Roberts "sitting on the floor outside [the] door, bloody and shaking and crying." (Tr. 120). Roberts' lips were "puffy and she had blood around her mouth." (Tr. 121). Roberts told Taylor that she had been walking home when Petitioner ran up behind her, pushed her to the ground, and then beat and raped her. (Tr. 122-23). Specifically, Roberts stated that Petitioner "tried to force her to perform

oral sex on him, and then proceeded to rape her." (Tr. 123). Taylor contacted the police who arrived at Taylor's residence a short time later. (Tr. 123-32). Roberts related to the officer the same version of events that she previously described to Taylor. (Tr. 132). Taylor then accompanied Roberts to have a rape kit performed. (Tr. 133).

**Frederick Straubel**

As of November 19, 2009, Straubel was employed as a Deputy with the Ionia County Sheriff's Department. (Trial Transcript, May 27, 2010, 159-60). Sometime that evening, Straubel was dispatched to the scene of an automobile accident. (Tr. 161). When Straubel arrived at the scene, fire department and medical first responder personnel were already present. (Tr. 161). Straubel spoke with Anthony Geister, but Petitioner had, by that time, already fled the scene. (Tr. 162-65).

**William Hoskins**

As of November 19, 2009, Hoskins was employed as a Sergeant with the Ionia County Sheriff's Department. (Trial Transcript, May 27, 2010, 190-91). Sometime that evening, Hoskins was dispatched to assist in the investigation of an automobile accident. (Tr. 192-94). Hoskins was later dispatched to Petitioner's residence where he assisted officers who were conducting a search thereof. (Tr. 195-96).

**Destiny Roberts**

Prior to November 19, 2009, Roberts and Petitioner had dated for several years. (Trial Transcript, May 27, 2010, 206-09). As of November 19, 2009, however, the pair "had broken up." (Tr. 209). Between 7:30-8:00 p.m. that evening, Roberts received a telephone call from Petitioner who stated that "he was in an accident and needed help." (Tr. 211). Roberts immediately traveled to Cristine Ruge's residence where she encountered Petitioner. (Tr. 211-13). Petitioner "had blood all over his face and he looked like his nose was broken." (Tr. 213). Roberts helped clean Petitioner's face. (Tr. 213).

At approximately 8:30 p.m., Roberts departed the residence alone and began walking home. (Tr. 214). Roberts was walking on a trail near a local baseball field. (Tr. 214). As Roberts was walking, she heard somebody running in her direction. (Tr. 215). Roberts moved to the side of the trial and looked behind her. (Tr. 215). Roberts observed Petitioner running toward her. (Tr. 215). When Petitioner reached Roberts, he "picked [her] up" and threw her to the ground, after which he began kicking and beating her. (Tr. 215-16). Roberts managed to get up and walk to a set of nearby bleachers where she began crying. (Tr. 216-18). Petitioner followed Roberts to the bleachers and apologized. (Tr. 218-19). However, when Roberts began walking away, Petitioner again attacked Roberts. (Tr. 219). Roberts testified that she did not remember anything that happened after this second attack. (Tr. 219-30).

**Ann Hunt**

As of November 19, 2009, Hunt was employed as a forensic scientist with the Michigan State Police. (Trial Transcript, May 27, 2010, 295). Sometime subsequent to this date,

Hunt processed the rape kit performed on Destiny Roberts. (Tr. 298). Hunt also processed the saliva samples obtained from Petitioner. (Tr. 300-01). A DNA analysis of semen located in Roberts' panties "matched [Petitioner's] DNA profile." (Tr. 301-06).


**Tammy Starr-Evans**

As of November 20, 2009, Starr-Evans was employed as a registered nurse and certified sexual assault nurse examiner. (Trial Transcript, May 28, 2010, 8-13). Early that morning, Starr-Evans conducted a sexual assault examination on Destiny Roberts. (Tr. 13-14). Roberts was "tearful" and "distraught." (Tr. 15). Roberts also exhibited "a lot of bruising, bleeding, and things like that." (Tr. 15). Starr-Evans indicated that she asks patients to describe what happened to them so that she can "know where to look for injury" or determine whether the patient requires more immediate medical treatment. (Tr. 16).

When asked what had happened to her, Roberts related the following. The previous evening, Petitioner called Roberts and said "that he had been in a bad car accident." (Tr. 17). Roberts traveled to where Petitioner was located. (Tr. 17). After determining that Petitioner was "okay," Roberts departed and began walking home. (Tr. 17). As she was walking, Petitioner approached Roberts from behind, knocked her to the ground, and began beating her. (Tr. 17). When Roberts attempted to get away, Petitioner "grabbed her again" and stated "I'm going to rape you." (Tr. 17). Petitioner then attempted to penetrate Roberts vaginally with his penis. (Tr. 18). Petitioner was unable to do so, at which point he forced Roberts to perform oral sex. (Tr. 18). Petitioner then vaginally penetrated Roberts with his penis. (Tr. 18). Starr-Evans then completed the examination properly preserving the various samples she obtained. (Tr. 18-32).

**Kirk DeLeeuw**

As of December 1, 2009, DeLeeuw was employed as a forensic scientist with the Michigan State Police. (Trial Transcript, May 28, 2010, 53-55). On that date, Officer David Thomas delivered to DeLeeuw certain items of evidence recovered from Petitioner and Destiny Roberts. (Tr. 54-55). The evidence was contained in a "sealed evidence collection kit" and secured in an evidence locker. (Tr. 55-56). DeLeeuw subsequently performed certain laboratory tests on the evidence samples, the results of which he provided to Ann Hunt. (Tr. 56-69).

**David Thomas**

As of November 19, 2009, Thomas was employed as a Patrol Investigator for the Belding Police Department. (Trial Transcript, May 28, 2010, 77-79). Shortly before midnight, Thomas was dispatched to Lacey Taylor's residence to investigate a complaint by Destiny Roberts. (Tr. 78-80). When Thomas arrived at Taylor's residence he observed that Roberts was "curled up almost like a ball. . .crying. . .[and] shaking." (Tr. 80). Roberts was speaking on a telephone "and telling someone that she had just been raped." (Tr. 80-81).

When Officer Thomas asked Roberts to describe what happened, Roberts related the following. Petitioner contacted Roberts earlier that evening to report that he had been involved in an accident. (Tr. 82-83). Roberts was concerned for Petitioner and, therefore, traveled to Cristine Ruge's residence at approximately 7:30 p.m. to assist Petitioner. (Tr. 82-83). Approximately one hour later, Roberts departed the residence and began walking home. (Tr. 83-84). As she was walking, Petitioner approached her from behind. (Tr. 84-85). Upon reaching Roberts, Petitioner "grabbed her by the neck and started yelling at her, started hitting her [and] punching her in the

face." (Tr. 85). Petitioner then threw Roberts to the ground and began kicking her. (Tr. 85).

Roberts was eventually able to stand up and begin running away, but Petitioner quickly "caught her

again and hit her some more." (Tr. 85).

Petitioner then began to sexually assault Roberts. (Tr. 85-86). Specifically,

Petitioner "pulled [Roberts'] pants and underwear down to her ankles" and "tried to force her to give

him oral sex." (Tr. 86). Petitioner then "forced [Roberts'] legs apart, got between her legs and

inserted his penis inside her for just a moment." (Tr. 86). While he was assaulting Roberts,

Petitioner told her that "he was going back to prison anyways, [so] this would be the last time they

could be together and have sex." (Tr. 87). Petitioner then told Roberts, "give it [sex] to me or I'll

knock you the fuck out and take it." (Tr. 87-88). Roberts eventually got away from Petitioner and

ran to Lacey Taylor's residence. (Tr. 88).

After speaking with Roberts, Officer Thomas secured her clothing as evidence. (Tr.

89-91). Thomas then transported Roberts to a clinic where she could undergo a sexual assault

examination. (Tr. 94). At the conclusion of the examination, Tammy Starr-Evans gave the evidence

she collected to Officer Thomas. (Tr. 104). Thomas secured the evidence at the police station and

later transported it to the Michigan State Police forensic laboratory for examination. (Tr. 104-05).

The following morning, Petitioner was interviewed by Detective Noll and Officer

Thomas. (Tr. 113-15). Noll spoke with Petitioner first concerning the automobile accident after

which Thomas interviewed Petitioner concerning Roberts' allegations. (Tr. 113-15). Prior to

beginning the interview, Petitioner was informed of his Miranda rights. (Tr. 114-15). Petitioner

waived his rights and agreed to speak with the officers. (Tr. 114-15). Petitioner offered the

following version of the relevant events.

Petitioner stated that following the automobile accident he went to Cristine Ruge's residence where he spoke with Destiny Roberts. (Tr. 117). A "few minutes" after Roberts departed, Petitioner began running after Roberts because he "wanted to talk to her some more." (Tr. 117). Petitioner soon caught up with Roberts and began talking with her. (Tr. 117-18). Petitioner became angry, however, when Roberts told him that "she didn't want to be with him anymore and wanted to be with someone else." (Tr. 117-18). Petitioner then began to beat Roberts. (Tr. 118). After struggling for "a few minutes," the pair walked to a nearby location and began talking. (Tr. 118). Petitioner then "reached one of his hands down inside [Roberts'] pants. . .and. . .put one of his fingers inside of her." (Tr. 118). Roberts "seemed okay" with his actions initially, but then said "no," at which point he "stopped right away." (Tr. 118).

Petitioner then asked Roberts "to perform oral sex on him," but she declined at which point Petitioner asked Roberts to "have sex with him." (Tr. 118). Roberts responded by "la[ying] back on one of the bleachers," but then stated that "it was too cold" and that "she didn't want to do it." (Tr. 118). Petitioner complied with Roberts' request and agreed to simply walk her home. (Tr. 118-19). When Thomas asked Petitioner to provide a written version of his statement, Petitioner "started to cry and said he didn't want to and didn't want to participate in the interview any more" at which the interview terminated. (Tr. 119).

**Anthony Geister**

Geister testified that on the day of the automobile accident with Jody Herrmann, Petitioner had not been drinking any alcohol. (Trial Transcript, May 28, 2010, 171-72). Geister

conceded, however, that at the time of the accident, Petitioner was "going down the middle of the road" and "was on his phone." (Tr. 173-74).

**Heather Jenkins**

As of November 19, 2009, Jenkins was dating Anthony Geister. (Trial Transcript, May 28, 2010, 196). Jenkins was speaking with Geister on the telephone when Petitioner struck Jody Herrmann's vehicle. (Tr. 196-97). Jenkins and her mother, Paulette Jenkins, immediately went to the scene of the accident to make sure Geister was not injured. (Tr. 197-99). When Jenkins arrived at the scene she determined that Geister was ok, after which Jenkins' mother left the scene to look for Petitioner. (Tr. 199-205). Jenkins later spoke with MacKenzie Conley who intimated that the automobile accident was caused by Jody Herrmann's erratic driving. (Tr. 200-01).

**Paulette Jenkins**

Jenkins testified that she has known Petitioner "for years." (Trial Transcript, May 28, 2010, 216). On November 19, 2009, Jenkins accompanied her daughter to the scene of the automobile accident involving Petitioner and Jody Herrmann. (Tr. 217). While at the scene, Jenkins received a telephone call from Petitioner who "didn't know exactly where he was." (Tr. 218-20). Jenkins left the accident scene and began searching for Petitioner. (Tr. 220). Jenkins eventually located Petitioner and drove him to Cristine Ruge's residence. (Tr. 220-22).

**Cristine Ruge**

Ruge was later recalled to testify by Petitioner. Ruge testified that approximately six weeks previously, Destiny Roberts informed her that Petitioner "did not sexually assault her and she doesn't know where that information came from." (Trial Transcript, May 28, 2010, 236-38).

**Christopher Simmons**

Simmons testified that he has known Petitioner for "a very, very long time" and that the pair were "very good friends." (Trial Transcript, May 28, 2010, 241-42, 254). Simmons owned the property on which Petitioner was living as of November 19, 2009. (Trial Transcript, May 28, 2010, 241). Subsequent to Petitioner's arrest, following the events of November 19-20, 2009, Destiny Roberts traveled to Petitioner's residence to recover the remainder of her belongings. (Tr. 242-43). During this visit, Simmons spoke with Roberts about her allegations against Petitioner. (Tr. 244). Roberts told Simmons that Petitioner "has never raped her." (Tr. 244). Roberts also told Simmons that she had been coerced and threatened into signing the written statement she provided to the police. (Tr. 244-45).

**Christine Young**

Young testified that her boyfriend and Petitioner were "good friends." (Trial Transcript, May 28, 2010, 262). Young further indicated that she had known Petitioner for approximately nine years. (Tr. 262). A "couple weeks" after the events in question, Young encountered Destiny Roberts, who stated to her that Petitioner "did not rape her or force her to have

sex in any way." (Tr. 264-65). Roberts further stated that the incident "had been blown out of proportion." (Tr. 266).

**James Emaus**

As of November 2009, Emaus was employed as a private investigator. (Trial Transcript, May 28, 2010, 274-75). Emaus was hired by the defense to "to do some investigation." (Tr. 276). In the course of his investigation, Emaus spoke with Destiny Roberts. (Tr. 276-77). Roberts told Emaus that Petitioner did not sexually assault her and that she "didn't understand where [the police] were getting this from, [because] she didn't even recall making those statements to the police." (Tr. 277-79).

**Bruce Lincoln**

Lincoln testified that he and Petitioner had been friends for approximately 25 years. (Trial Transcript, May 28, 2010, 281-82). Following Petitioner's arrest, Lincoln spoke with Roberts. (Tr. 282-83). Roberts informed Lincoln that Petitioner did not rape her. (Tr. 284). Roberts further stated that she was "extremely angry" with the prosecuting attorney and the police because she "tried to retract her statement and nobody would pay any attention to her." (Tr. 283).

Following the presentation of evidence, the jury found Petitioner guilty of all charges. (Trial Transcript, May 28, 2010, 437-38). Petitioner was sentenced, as a fourth habitual offender, to serve 27-60 years in prison. (Sentencing Transcript, July 20, 2010, 31-32). Petitioner was also given a consecutive sentence of 2-4 years having subsequently been convicted (after pleading guilty) of threatening certain witnesses who testified at his trial. (Tr. 25, 32). Petitioner appealed his

conviction in the Michigan Court of Appeals, asserting the following claims:

> I.    Mr. Bodman allegedly caused a serious car accident and later that night sexually assaulted his ex-girlfriend. The events were unrelated, except that the trial court used an alleged statement by Mr. Bodman that because he was going to prison anyway, he might as well assault his ex-girlfriend to find a relationship and join the trials. Even assuming the truth of the statement, where it did not evidence a pre-planned scheme uniting the crimes and did not otherwise connect the crimes as required under the court rule, was it prejudicial error and a denial of due process to join the two matters in one trial?

> II.   The testimonial evidence in support of the first-degree criminal sexual conduct was that Mr. Bodman could not get an erection and did not penetrate the complainant. The forensic evidence that identified some sperm that could not be linked to Mr. Bodman could not overcome this testimonial deficiency. Was there insufficient evidence of first-degree criminal sexual conduct under the U.S. and Michigan Constitutions?

> III.  Is Mr. Bodman entitled to resentencing because the sentence imposed is a departure beyond the statutory maximum?

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Bodman*, 2011 WL 5461762 (Mich. Ct. App., Nov. 10, 2011). Raising claims I and II, as well as several additional claims, Petitioner later moved in the Michigan Supreme Court for leave to appeal this determination. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Bodman*, 812 N.W.2d 740 (Mich. 2012). On August 13, 2012, Petitioner initiated the present action in which he asserts claims I and II above.

## STANDARD OF REVIEW

Bodman's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)      An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>      (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
>      (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the

merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de

novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I. Joinder

Petitioner first asserts that joinder in one trial of the charges arising out of the automobile accident and the charges concerning his subsequent assault of Destiny Roberts constituted "a denial of due process." Petitioner also argues that such violated Michigan Court Rule 6.120.

First, to the extent that Petitioner is challenging his conviction based upon a perceived violation of Michigan law or court rule, such cannot form the basis for the relief Petitioner seeks. *See* 28 U.S.C. § 2254(a) (habeas relief can be obtained "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States").

As for Petitioner's claim that his right to due process under federal law was violated, the result is the same. Before addressing the merits of this particular claim, the issue of exhaustion must first be addressed. Respondent argues that Petitioner has not properly exhausted his claim that the joinder in a single trial of the various charges violated his *federal* rights. Specifically, Respondent argues that while Petitioner clearly argued in state court that this circumstance violated state law, he never fairly presented to the state courts the claim that such likewise constituted a violation of his *federal* rights. Respondent further argues that because Petitioner has failed to

exhaust this particular claim, the Court must dismiss the present petition as a mixed petition. *See Rose v. Lundy*, 455 U.S. 509 (1982) (the Court must dismiss a habeas petition asserting both exhausted and unexhausted claims).

While Respondent's argument is not without merit, the Court notes that Petitioner did argue in state court that the joinder in a single trial of all the charges he faced violated his right to "due process." Moreover, certain of the cases cited by Petitioner in his state court brief relied upon or discussed misjoinder as a violation of federal law. The Court notes that the threshold for satisfying the "fair presentation requirement" is not particularly demanding. *See, e.g., Ross v. Pineda*, 2013 WL 6698036 at *11-12 (6th Cir., Dec. 19, 2013) ("a petitioner is not required to cite cases applying federal constitutional principles where he has articulated his claim in terms of a denial of a specific constitutional right"). However, the Court need not resolve this particular issue because the Court possesses the authority to deny on the merits unexhausted claims asserted in a habeas petition. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). Petitioner has not requested that the Court stay the present matter to further pursue this particular claim.[1] Accordingly, the Court will address the merits of Petitioner's claim.

As the United States Supreme Court has observed, "[i]mproper joinder does not, in itself, violate the Constitution." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). Instead, misjoinder offends the Constitution only if it results in "prejudice so great" as to deny a defendant

---

[1] Petitioner has requested that the Court stay this matter so that he could pursue in state court very different claims. As the Court repeatedly concluded, however, Petitioner has failed to demonstrate entitlement to such relief. (Dkt. #6, 25, 27).

his constitutional right to a fair trial. *Id.*; *see also*, *Coley v. Bagley*, 706 F.3d 741, 753 (6th Cir. 2013). Because claims of misjoinder are subject to harmless error analysis, Petitioner must demonstrate that the alleged misjoinder "had substantial and injurious effect or influence in determining the jury's verdict." *Coley*, 706 F.3d at 753 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

As courts recognize, there exists a "risk of undue prejudice" whenever joinder of charges permits the prosecution to introduce "evidence of other crimes that would otherwise be inadmissible." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007). However, to obtain habeas relief, Petitioner must demonstrate "*actual* prejudice, not merely the *potential* for prejudice." *Id.* In this respect, the Court notes that "[p]rejudicial joinder is particularly unlikely 'where it would not have been difficult for the jury to compartmentalize and distinguish the evidence concerning the different offenses charged.'" *United States v. Cody*, 498 F.3d 582, 587 (6th Cir. 2007) (citation omitted). Moreover, any error based on alleged misjoinder "is almost always harmless where. . .the trial court issues a careful limiting instruction to the jury on the issue of possible prejudice resulting from the joinder." *Id.*

Prior to trial, Petitioner moved to sever the trials of the charges arising out of the automobile accident and the charges concerning his subsequent assault of Destiny Roberts. The trial judge denied Petitioner's request, finding that the various offenses were "a series of connected acts" or "a series of acts constituting parts of a single scheme or plan." (Hearing Transcript, January 19, 2010, 17-27). The judge based her decision on the statement Petitioner allegedly made to Destiny Roberts that since he would be returning to prison anyway, because of his actions earlier in the evening, it did not matter whether she consented to have sex. (Tr. 20-27). Specifically, the judge

stated, "I really find that this alleged statement that [Petitioner] has made really does draw these matters together." (Tr. 26). The judge further concluded that joinder of the various charges would not deprive Petitioner of a fair trial. (Tr. 26-27). The Michigan Court of Appeals likewise rejected Petitioner's claim that joinder of the various charges was improper. *See Bodman*, 2011 WL 5461762 at *1.

In *United States v. Chavis*, 296 F.3d 450 (6th Cir. 2002), the court was presented with a claim of misjoinder. *Id.* at 453-56. While the court found that the joinder of the two charges in question was improper, the court further found that this error was harmless and, therefore, did not merit relief, in light of the following instruction from the trial judge to the jury:

> The defendant has been charged with more than one crime. The number of charges is in no way evidence of guilt. . .[I]t is your duty to consider separately. . .the evidence that relates to each charge and to return a separate verdict for each one. For each charge, you must decide whether the government has presented proof beyond a reasonable doubt. . .You decision on one charge, whether it is guilty or not guilty, should not influence your decision on any of the other charges.

*Id.* at 462.

When instructing the jury at Petitioner's trial, the judge specifically stated that "[t]he fact that [the defendant] is charged with more than one crime is not evidence." (Trial Transcript, May 28, 2010, 403). The judge also instructed the jury that the prosecutor must establish beyond a reasonable doubt that Petitioner committed each particular crime. (Tr. 410-29). The judge further instructed the jury:

> The defendant is charged with six counts. . .These are separate crimes and the Prosecutor is charging that the defendant committed all of them. You must consider each crime separately in light of all the evidence in this case. You may find the defendant guilty of all or any

combination of these crimes; guilty of a less serious crime or not guilty.

(Tr. 409-10).

In the Court's estimation, the aforementioned instructions convey the same substance as the instructions the *Chavis* court concluded rendered harmless the improper joinder in that particular case. In both cases, the jury was instructed: (1) that the number of charges did not constitute evidence; (2) each charge had to be considered separately; and (3) each charge had to be proven beyond a reasonable doubt. Moreover, given the significant difference in the charges related to the automobile accident and the charges related to the sexual assault, it would not have been difficult for the jury to "compartmentalize and distinguish the evidence concerning the different offenses charged," which as previously noted weighs against a finding that Petitioner suffered unfair prejudice. The Court concludes, therefore, that even if it is assumed that joinder of the charges in this matter was improper, any such error was harmless in light of the judge's instructions to the jury. In sum, Petitioner was not deprived of the right to a fair trial. Accordingly, this claim is rejected.

## II.        Sufficiency of the Evidence

Petitioner next asserts that there did not exist sufficient evidence to convict him of First Degree Criminal Sexual Conduct. Specifically, Petitioner asserts that the prosecution failed to present sufficient evidence that he committed "sexual penetration" of Destiny Roberts.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found

Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect as of November 19, 2009, an individual was guilty of criminal sexual conduct in the first degree if he engages in sexual penetration with another person and if any of the following circumstances exists:

(f)   The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration. Force or coercion includes but is not limited to any of the following circumstances:

(i)   When the actor overcomes the victim through the actual application of physical force or physical violence.

(ii)  When the actor coerces the victim to submit by threatening to use force or violence on the victim, and the victim believes that the actor has the present ability to execute these threats.

(iii) When the actor coerces the victim to submit by threatening to retaliate in the future against the victim, or any other person, and the victim believes that the actor has the ability to execute this threat. As used in this subdivision, "to retaliate" includes threats of physical punishment, kidnapping, or extortion.

(iv)  When the actor engages in the medical treatment or examination of the victim in a manner or for purposes which are medically recognized as unethical or unacceptable.

(v)     When the actor, through concealment or by the element of surprise, is able to overcome the victim.

Mich. Comp. Laws § 750.520b(1)(f).

Under Michigan law, "sexual penetration" is defined as "sexual intercourse. . .fellatio. . .or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." Mich. Comp. Laws § 750.520a(r).

Lacey Taylor testified that Roberts stated to her that Petitioner "tried to force her to perform oral sex on him, and then proceeded to rape her." Ann Hunt testified that a DNA sample of semen located in Roberts' underwear matched Petitioner's DNA profile. Tammy Starr-Evans testified that Roberts stated to her that Petitioner grabbed her and stated that he was going to rape her. Petitioner then attempted to penetrate Roberts vaginally with his penis, but was unable to do so, at which point he forced Roberts to perform oral sex. Petitioner then vaginally penetrated Roberts with his penis. Officer David Thomas testified that Roberts related to him that Petitioner tried to force her to perform oral sex after which he penetrated her vagina with his penis.

While Petitioner is correct that evidence was presented that could support an acquittal on this particular charge, the evidence must be viewed in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution. Moreover, to the extent there exists conflicting evidence, the Court must presume that the jury resolved any such conflicts in favor of the prosecution. Petitioner is essentially asking this Court to re-weigh the evidence and substitute its judgment for that exercised by the jury. As previously noted, the Court is not permitted to so act. Simply stated, a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt of the charge of First Degree Criminal Sexual Conduct.

The Michigan Court of Appeals concluded that there existed sufficient evidence from which to conclude beyond a reasonable doubt that Petitioner committed First Degree Criminal Sexual Conduct. *See Bodman*, 2011 WL 5461762 *2. In light of the authority and evidence identified above, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Bodman's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: April 9, 2014                     \_\_/s/ Ellen S. Carmody_____
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge